UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LINDA LOUISE JANNETIDES,

             Plaintiff,

v.                                                    CASE NO. 3:10-cv-00259-J-JBT

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

             Defendant.
_____/

## ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative

decision denying her application for a Period of Disability and Disability Insurance

Benefits ("DIB").  The Court has reviewed the record, the briefs, and the applicable

law.  For the reasons set forth herein, the Commissioner's decision is due to be

**REVERSED and REMANDED**.

## I.       Issues on Appeal and Summary of Decision

The two issues on appeal, as framed by Plaintiff, are: (1) whether the

Administrative Law Judge ("ALJ") "erred by not affording great weight to the opinions

of Dr. Oteyza" as to Plaintiff's back condition; and (2) whether the ALJ "erred by

substituting his opinion for the opinions of [Dr. Oteyza]" as to Plaintiff's diagnosis of

carpal tunnel syndrome ("CTS").  (Doc. 12.)  The Court holds that the ALJ's decision

to reject Dr. Oteyza's opinions on the first issue is supported by good cause and

substantial evidence.  However, the ALJ's decision to discount Plaintiff's diagnosis

_____

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate
Judge.  (Docs. 8 & 9.)

of CTS for purposes of determining whether Plaintiff's CTS was a medically determinable impairment, is not supported by substantial evidence.  Therefore, the ALJ's decision must be reversed and the case remanded for further proceedings consistent with this Order.

## II.    Procedural History and Summary of the ALJ's Decision

On January 6, 2006, Plaintiff filed an application for a Period of Disability and DIB, alleging she became disabled on March 27, 2004.[2]  (Tr. 70-77.)  The Social Security Administration ("SSA") denied this application initially and on reconsideration.  (Tr. 35-36, 55-58, 63-66.)  Plaintiff then requested and received a hearing before the ALJ on April 15, 2008, during which she was represented by an attorney.  (Tr. 37-42, 53, 705-37.)  Plaintiff and Charles Heartsill, a vocational expert ("VE"), appeared and testified at the hearing.  (Tr. 705-37.)  Because additional evidence was required, a subsequent hearing was held on September 18, 2008, during which Plaintiff was again represented by an attorney.  (Tr. 687-90, 738-809.)  Plaintiff, Robert Strader, a VE, Dr. Bruce Witkind, a medical expert ("ME"), and Dr. Carlos Kronberger, another ME, all appeared and testified at the hearing.  (Tr. 738-809.)

On December 18, 2008, the ALJ issued his decision, finding Plaintiff not

---

[2] Plaintiff's last day at work was March 26, 2004, but she remained an employee of Moosehaven until October 6, 2004, at which time she was officially terminated from the Moosehaven payroll after her short term disability ended and her personal and vacation time was used.  (Tr. 32, 67.)

disabled and denying her claim.  (Tr. 14-30.)  The ALJ first determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009.  (Tr. 19.)  At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 27, 2004.  (*Id*.)  At step two, the ALJ determined that Plaintiff had "the following severe impairments: degenerative disc disease of the lumbosacral spine" and "the following non-severe impairments: hepatitis C; generalized anxiety disorder; [and] depression."  (*Id*.)  At step three, the ALJ concluded that Plaintiff did not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 22.)

The ALJ then determined that Plaintiff had the Residual Functional Capacity ("RFC") to perform light work "except for work requiring: more than occasional bending at the waist; [and] climbing of ropes, ladders and scaffolding."  (*Id*.)  Next, at step four the ALJ determined that Plaintiff was unable to perform any of her past relevant work.  (Tr. 28.)  The ALJ then found that considering Plaintiff's age of forty-seven on the alleged disability onset date, Plaintiff would be defined as a younger individual under 20 C.F.R. § 404.1563.  (*Id*.)  He also determined that Plaintiff had at least a high school education and was able to communicate in English.  (*Id*.)

As step five, based on the VE's testimony and considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform."

3

(Tr. 28-29.)  The ALJ noted the VE testified that an individual in Plaintiff's position would be able to perform the requirements of such representative occupations as parking lot cashier, gate guard, companion, and general office clerk.  (Tr. 29.)  Thus, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act from March 27, 2004 through December 18, 2008.  (Tr. 17, 30.)

Following the ALJ's decision, Plaintiff filed a Request for Review by the Appeals Council, which was denied on January 26, 2010.  (Tr. 6-10.)  Accordingly, the ALJ's December 18, 2008 decision is the final decision of the Commissioner.  On March 25, 2010, Plaintiff timely filed her Complaint in this Court.  (Doc. 1.)

### III.   Social Security Act Eligibility and Standard of Review

A claimant is entitled to disability benefits when she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.   42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  The Commissioner has established a five-step sequential analysis for evaluating a claim of disability.  *See* 20 C.F.R. § 404.1520.  The claimant bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The scope of this Court's review is limited to determining whether the ALJ

4

applied the correct legal standards and whether the findings are supported by substantial evidence. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla, *i.e.*, evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (per curiam) (internal citations omitted); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam) ("Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'").

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991) (per curiam). "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote*, 67 F.3d at 1560; *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings).

IV.     **Summary of Evidence**[3]

A.      **Treating Source Evidence**

1.      **Dr. Carlos A. Oteyza**

Dr. Carlos Oteyza saw Plaintiff ten to twelve times a year from March 4, 2002 through at least April 25, 2008.  (*See, e.g.*, Tr. 182-212, 328, 332, 337, 343, 351, 355, 360, 363, 367, 373, 378, 383, 386, 392, 397, 407, 411, 420, 425, 430, 444, 449, 485, 491, 529, 540, 545, 562, 614, 618, 624, 626, 629, 633, 637, 649, 655.) Although Dr. Oteyza's progress reports typically do not document a physical examination, Dr. Oteyza submitted an explanation of his Medical Source Statement in which he stated that on each occasion he saw Plaintiff, he routinely performed a physical examination that lasted on average fifteen to twenty minutes.  (Tr. 662.)  His progress notes reflect that on each visit, Plaintiff was experiencing pain in her left arm, right wrist, and/or lower back.  (*See, e.g.*, Tr. 182-212, 328, 332, 337, 343, 351, 355, 360, 363, 367, 373, 378, 383, 386, 392, 397, 407, 411, 420, 425, 430, 444, 449, 485, 491, 529, 540, 545, 562, 614, 618, 624, 626, 629, 633, 637, 649, 655.)

During his initial March 4, 2002 physical examination of Plaintiff, Dr. Oteyza noted that she had "pain and tenderness to the biceps/triceps muscles on the left arm in addition to pain with movement to her left shoulder," as well as "pain and tenderness to her right wrist."  (Tr. 655.)  His neurological examination showed:

---

[3] The issues before the Court involve Plaintiff's physical impairments; therefore, the Court will not discuss Plaintiff's mental impairments.

> possible ulnar neuropathy on the right in addition to a possible nerve
> injury to the axillary/radial nerves to her left arm. . . . Diffused spasms
> to the lower back with some tenderness noted on depression. . . .
> Numbing sensation to the right ulnar nerve distribution through sensory
> testing.  No atrophy noted at this time on inspection to the right hand
> muscles.[4]

(*Id.*) He diagnosed Plaintiff with possible fracture to the right wrist, ulnar neuropathy,

left arm pain involving biceps/triceps muscles, possible rotator injury on the left

shoulder, and lower back pain.  (Tr. 656.)  His plan was "EMG/Nerve Conduction

Study to the upper extremities in addition to reviewing x-rays" that were previously

ordered.  (*Id.*)  On April 15, 2002, Dr. Oteyza again wrote that his plan included an

EMG/Nerve Conduction Study after noting that Plaintiff's "right wrist was swollen and

[was] weak with lifting."  (Tr. 649.)

When the EMG/Nerve Conduction Study was performed on May 9, 2002, Dr.

Oteyza interpreted the study as "abnormal . . . of the right median nerve showing

prolong median sensory distal latency compatible with [CTS]."  (Tr. 640.)  When Dr.

Oteyza saw Plaintiff on May 13, 2002, he noted that the EMG/Nerve Conduction

Study "revealed a positive [CTS] on her right hand with problems to her left arm."

(Tr. 637.)  He wrote that Plaintiff needed "special therapy directed to her right wrist"

and was "provided with a carpal tunnel splint to be used when she [was] lifting

patients at work at Moosehaven."  (*Id.*)  On June 10, 2002, Dr. Oteyza again noted

that Plaintiff should "use a carpal tunnel splint while at work."  (Tr. 633.)  A progress

---

[4] Dr. Oteyza is board certified in physical medicine and rehabilitation.  (*See, e.g.*, Tr.
663.)  He is not a neurologist.

report dated February 10, 2003 shows that Plaintiff "continues to use a wrist splint when she is lifting patients" and that the "range of motion to her wrist has improved," even though "it is still guarded and painful." (Tr. 614.)

Although Plaintiff's last day at work was March 26, 2004 (Tr. 32, 67), Dr. Oteyza's Progress Reports dated May 3, 2004, April 12, 2004, and June 28, 2004, show that Plaintiff "continues to work at Moosehaven on modified duties to prevent aggravating her left arm and right wrist" pain (Tr. 197-99).

On December 13, 2004, Plaintiff underwent an MRI of the lumbar spine, which showed:

> Isolated degenerative disc disease L4-L5, L5-S1 more advanced at the L5-S1 level with a circumferential disc protrusion in conjunction with mild facet degenerative changes resulting in moderately severe inferior neural foraminal narrowing bilaterally.  There is a mild circumferential bulge at L4-L5 and mild degrees of facet osteoarthritis and ligamentum flavum hypertrophy at this level as well resulting in mild degrees of central canal stenosis.  On the right in the right neural foramen and laterally is a small annular tear as well.

(Tr. 519-20.)

Dr. Oteyza's records indicate that Plaintiff was "treated mainly with medication" and sometimes therapy.  (*See, e.g.*, Tr. 182-212, 328, 331, 336, 351.) During various times, he wrote that Plaintiff was able to function, or find relief, with her medication.  (Tr. 186, 192, 199, 205, 209-10, 212, 397.)  On August 5, 2005, Dr. Oteyza wrote that her "pain continues to be a problem when she does not take her medication."  (Tr. 186.)  On April 22, 2005, he noted that Plaintiff "ha[d] responded very well with the home traction unit" and that she "use[d] a heating pad at home for

8

the pain to her lower back." (Tr. 491.)

Dr. Oteyza's June 3, 2005 physical examination showed "multiple trigger points to the lumbar paraspinal muscles."[5] (Tr. 187.) On December 8, 2005, he wrote: "Patient opted to place surgery on hold and requested conservative care and physical therapy." (Tr. 449.) His August 31, 2006 Progress Report provides that Plaintiff's pain drops with physical therapy, but increases to 10/10 "with only taking medication." (Tr. 402.)

On February 14, 2006, a Functional Capacities Evaluation ("FCE") was completed by an unknown evaluator, which showed that maximum effort and appropriate pain behaviors were not demonstrated. (Tr. 434.) Although the FCE was left unsigned, its location in the record and the Court Transcript Index indicate that it was possibly completed by or at the direction of Dr. Oteyza.[6] The evaluator opined that Plaintiff can frequently (34-66% per day) sit and stand; and occasionally (1-33% per day) walk, stoop, crouch, climb stairs, kneel, and reach. (*Id.*) Her

---

[5] The June 3, 2005 progress report was one of the few that contained documentation of a physical examination.

[6] It is unclear from the ALJ's opinion whether Dr. Oteyza completed this FCE. (*See* Tr. 27.) The ALJ's opinion provides:

> Dr. Oteyza further offered a vague report that he had considered the FCE results and that he had weighed any inconsistencies between that testing and his own findings. Yet, Dr. Oteyza did not describe the nature [of] his 'own findings' or identify any inconsistencies. Dr. Oteyza's treatment records do not establish ongoing abnormal findings or document that he considered the claimant's invalid presentation during the FCE.

(*Id.*)

musculoskeletal test results showed 5/5 strength in her right and left wrists, thumbs, and fingers. (Tr. 436-37.) The evaluator placed Plaintiff in the sedentary classification. (Tr. 434.) Under Summary/Recommendations, the evaluator wrote: "Client did not perform with consistent effort—results reflect a minimum level of function only." (*Id.*) The evaluator also commented that Plaintiff "demonstrated cogwheeling behaviors supporting lack of full effort—functional strength noted." (Tr. 437.)

Dr. Oteyza's progress reports between March 1, 2007 and March 28, 2008, reflect his opinion that Plaintiff "is totally disabled for any occupation." (Tr. 332, 337, 343, 347, 351, 355, 383.) On March 28, 2008, he wrote that Plaintiff "has no relief with the pain medication or the physical therapy." (Tr. 332.) His April 25, 2008 progress report demonstrates that Plaintiff's "pain level . . . [was] rated at 10/10 with and without medication" and that "[s]he continues to be under [their] pain management program." (Tr. 328.)

Earlier that month, on April 15, 2008, Dr. Oteyza completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) ("MSS"). (Tr. 301-04.) He imposed the following limitations on Plaintiff: lift and/or carry less than 10 pounds both occasionally and frequently; stand and/or walk for less than two hours; sit for less than six hours and periodically alternate sitting and standing to relieve pain or discomfort; and limited pushing and/or pulling in upper and lower extremities. (Tr. 301-02.) These limitations were based on the lumbar MRI report, which Dr. Oteyza

apparently interpreted as showing "L4/L5 and L5/S1 lumbar disc herniation."[7]   (Tr. 301.)   Dr. Oteyza also wrote that Plaintiff should never climb ramps/stairs/ladders/ropes/scaffolds; should never kneel, crouch, and crawl; should only occasionally balance, stoop, reach, handle, finger; but may frequently feel.  (Tr. 302-03.)   Dr. Oteyza opined that Plaintiff's manipulative functions were limited because the EMG study showed "left ulnar upper extremity neuropathy and severe [CTS] to the right hand."  (Tr. 303.)

### 2.   Dr. Gregory Keller

On November 18, 2005, Dr. Keller, an orthopaedic specialist at Jacksonville Orthopaedic Institute, examined Plaintiff for her back and leg pain.  (Tr. 295.)  The pain diagram completed by Plaintiff indicates that Plaintiff's pain was 10 out of 10 or greater, was constant, was "exacerbated by standing, bending, walking and exercise," and was "relieved with rest and medication."  (*Id.*)  Dr. Keller wrote:

> **PHYSICAL EXAMINATION:**
> [T]his is a well-developed, well-nourished female in no acute distress but she is in some obvious discomfort, however. . . . Exam of her back reveals no deformity or scars.  Hip range of motion is not painful.  The pelvis is level.  Sitting exam reveals intact DTR's of the knees and ankles.  No clonus.  Sensation is intact at L3 through S1 dermatomes with respect to light touch.  Motor strength is intact to manual testing in both lower extremities, all groups.  Sitting exam reveals negative straight leg raising bilaterally.
> **RADIOGRAPHS:**
> Plain films of the lumbar spine, two views, reveals severe degenerative changes at L5 S1, mild degenerative changes at 3-4 and 4-5. . . .  MRI

---

[7] This interpretation appears to be inconsistent with the MRI report itself, which does not mention any herniation.  (Tr. 703-04.)

reveals desiccation and degeneration at 4-5 and 5-1, otherwise unremarkable.
. . .
**IMPRESSION:**
Chronic back and referred leg pain secondary to two level degenerative disc disease.
**DISPOSITION:**
. . . The only surgical option would be a two level fusion. . . .  If she wishes to pursue that then a discogram to exclude the possibility of a pain being generated by an upper disc should be done prior to any surgical planning.  She would also have to stop smoking.

(Tr. 295-96.)  Under Work Status, Dr. Keller wrote: "Temporary total disability."  (Tr. 297.)

On September 16, 2008, in a conclusory, hand-written note, Dr. Keller opined that Plaintiff met the Listing of Impairments 1.04(A), titled disorders of the spine.  (Tr. 31, 661.)

## B.  Examining Consultative Evidence

### 1.  Dr. Lynn Harper-Nimock

On June 26, 2006, Dr. Harper-Nimock performed an internal medicine examination of Plaintiff.  (Tr. 216-19.)  The examination revealed:

The claimant appeared to be in mild distress. . . . Could not walk on heels or toes.  Able to squat partial. . . . Able to get on and off exam table with minimal difficulty. Able to rise from chair with minimal difficulty. . . . Lumbar spine shows decreased flexion, extension, lateral flexion, and decreased rotatory motion bilaterally.  The claimant had positive SLR to 60 degrees bilaterally. . . .  The claimant had decreased ROM of hips bilaterally. . . . hand and finger dexterity intact.  Grip strength 5/5 bilaterally.

(Tr. 217-18.)

Dr. Harper-Nimock diagnosed Plaintiff with a history of the following: degenerative disk disease; "lower back pain with radiculopathy"; "nerve damage, left arm and right wrist"; "pain, dorsal aspect of left foot"; hepatitis C; anxiety and depression; and tobacco use.  (Tr. 219.)  Her prognosis for Plaintiff was fair.  (*Id.*) Her Medical Source Statement indicated that Plaintiff had "mild to moderate limitations for prolonged sitting, standing, walking, climbing, or heavy lifting."  (*Id.*)

### 2.     Dr. William V. Choisser

On February 13, 2007, Dr. Choisser, a Family Practice - General Practice physician, examined Plaintiff.  (Tr. 272-73.)  The examination revealed:

> Grip and fine dexterity are 5/5 and equal bilaterally. . . . She has difficulty getting on and off the exam table because of her back pain. Straight leg raises are possible to just 20 degrees bilaterally seated and to just 5 degrees bilaterally supine. . . . The left foot has good ROM, but it is tender on the dorsum due to previous trauma. . . . The patient is able to walk 30 feet without the use of an assistive device.  Heel to toe walking is unstable.  ROM of the lumbar spine anteriorly is just possible to 20 degrees before she has back pain.  There is some moderate paravertebral muscle spasm noted along the lumbar spine.

(Tr. 273.)  Dr. Choisser's impressions were intractable lumbosacral spine pain, left foot pain, and Hepatitis C, untreated.  (*Id.*)

### C.     Non-Examining Consultative Evidence

### 1.     Dr. Donald Morford

On August 1, 2006, Dr. Morford completed a Physical RFC Assessment on Plaintiff.  (Tr. 238-45.)  His primary diagnoses were low back pain and bilateral hip pain, and his secondary diagnosis was chronic persistent Hepatitis C.  (Tr. 238.)

Under Other Alleged Impairments, Dr. Morford wrote: left foot, left arm, and right wrist pain.  (*Id.*)  The limitations imposed by Dr. Morford included: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and/or sit for six hours; limited pushing and/or pulling in lower extremities; occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; no climbing of ladders/ropes/scaffolds; avoiding concentrated exposure to hazards.  (Tr. 239-42.) Dr. Morford wrote that "[s]moking cessation and continued medical treatment should help" Plaintiff's symptoms.  (Tr. 243.)

### 2.      Dr. Nicholas Bancks

On February 28, 2007, Dr. Bancks completed a Physical RFC Assessment on Plaintiff.  (Tr. 277-84.)  The limitations imposed by Dr. Bancks included: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and/or sit for six hours; frequent climbing of ramps/stairs, kneeling, and crawling; occasional climbing of ladders/ropes/scaffolds, balancing, stooping, and crouching; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc., and hazards.  (Tr. 278-81.)

### 3.      Dr. Bruce Witkind

During the September 18, 2008 hearing before the ALJ, Dr. Witkind, a board certified neurosurgeon, testified at the ALJ's request.  (Tr. 742-68.)  Dr. Witkind noted "apparently, Dr. Oteyza does his own electrodiagnostic studies, though he's not a certified neurologist."  (Tr. 747.)  With respect to Plaintiff's right wrist pain, Dr.

14

Witkind testified that it "should be somewhat of a mild case of [CTS]," that the EMG "just show[ed] some mild increased latency of the speed of neural traveling across the right carpal tunnel," that "[t]hese are mild findings, and there's no atrophy noted in the right hand or thumb." (Tr. 748.) Dr. Witkind noted that "no surgery of the right wrist was ever recommended." (*Id.*)

Dr. Witkind commented as follows on Dr. Oteyza's findings:

[Dr. Oteyza] states: "Indicating sensitivity to the right lower extremity nerve." Well, anatomically there is no such thing as a right lower extremity nerve, so the exam is basically of no reliable import. . . . In Exhibit 19F, Page 153, on 4/5/05, some sort of machine-driven electrodiagnostic study was performed by Dr. Oteyza, where is [sic] conclusion is, left radiculopathy at the L4-5 level. That's not a reasonable diagnosis by a competently trained electro-physiologist because there are more than one nerve. And he's basically stating lumbar radiculopathy at L4-5. That could've been any of four possible nerves, as well as the entire system. I have to discount that electrodiagnostic study. Should be done by a board-certified neurologist. And certainly there's no corroboration between the physical examination and "lumbar radiculopathy at the L4-5 level," which is the conclusion of the EMG. . . . Nevertheless, it's a questionable study. . . . [The] MRI scan at L4-5 is really showing degenerative disc disease, negative for foramenal stenosis, and mild central canal stenosis, and a right annular tear. None of these cause any significant [nerve] compression, and therefore this is not at all compatible with the EMG stating there was radiculopathy at the L4-5 level.
. . .
[The MRI] shows a right annular tear, which is not uncommon. But very mild central canal stenosis, which is non-surgical. And no foramenal stenosis. So these findings are in no way compatible with a level of 10 of 10 pain level, which would mean that the nerves would have to be crushed to get that level of pain, and that's not really any nerve compression. Also, at L5-S1 there was some -- what the radiologist read as moderately severe inferior foramenal stenosis, and narrowing the neural foramen bilaterally at L5-S1. Again, these findings are all

compatible with an age of 51 or early to mid-50s. . . . So the physical exam never fits the EMG, and the EMG never fits the MRI scan.  And certainly, the level of degenerative disc disease is not compatible with 10 out of 10 pain pattern, along with huge narcotic intake for unknown reasons.

(Tr. 749-50.)

Dr. Witkind opined that the "degenerative disc disease and mild osteoarthritis [are] compatible with age."  (Tr. 752.)  With respect to Dr. Oteyza's diagnosis of CTS, Dr. Witkind expressed that Plaintiff "doesn't have any documented pattern of [CTS]" and "[i]t's mostly an electrodiagnostic finding."  (*Id.*)  Dr. Witkind also discounted the examination by Dr. Choisser because the results of his straight leg raising test were "physiologically impossible" and showed a "lack of neurologic education."  (Tr. 753.)  Dr. Witkind also rejected the conclusory statement by Dr. Keller that Plaintiff meets Listing 1.04(A) because it was inconsistent with Dr. Keller's essentially normal physical examination.  (Tr. 758.)

Dr. Witkind opined that Plaintiff was "at a medium level of work," and that she can lift, carry, push, and pull 40 pounds occasionally and 30 pounds frequently; stand/walk for six hours; bend at the waist occasionally; and she should not climb ropes/ladders/scaffolds.  (Tr. 761-62.)

## V.     Analysis

### 1.     The ALJ's Decision to Reject Dr. Oteyza's Opinions Regarding Plaintiff's Back Condition Is Supported by Substantial Evidence

Substantial weight must be given to a treating physician's opinion unless there

16

is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).  A treating physician's opinion on the nature and severity of Plaintiff's impairments is given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if "it is not accompanied by objective medical evidence or is wholly conclusory."  *Edwards*, 937 F.2d at 583.  "The weight afforded a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence as to claimant's impairments."  *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986) (per curiam); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987) (finding that a treating physician's opinion that claimant was totally disabled was properly discounted because "it was not supported by objective medical evidence and was merely conclusory").

In *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004), the Eleventh Circuit reiterated that "good cause" must exist to reject the opinion of a treating physician.  The court stated that "'good cause' exists when the: (1) treating physician's opinions was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.* at 1241.

17

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); *see also* 20 C.F.R. § 404.1527(d)(2).

In the present case, the ALJ's decision to reject the conclusory opinions of Dr. Oteyza regarding Plaintiff's back condition, is supported by good cause and substantial evidence. The ALJ rejected Dr. Oteyza's opinion that Plaintiff was "totally disabled for any occupation" (Tr. 332, 337, 343, 347, 351, 355, 383), as a legal conclusion left to the Commissioner (Tr. 25). Pursuant to 20 C.F.R. § 1527(e), a statement by a medical source that the claimant is disabled or unable to work is not given any special significance because it is an issue reserved to the Commissioner. "[E]ven when offered by a treating source, [such statements] can never be entitled to controlling weight or given special significance." SSR 96-5p. *See also Phillips*, 357 F.3d at 1241 (stating that good cause exists when a treating physician's opinion is conclusory). Therefore, the ALJ properly rejected Dr. Oteyza's statements of total

18

disability.

Further, the ALJ's decision to reject Dr. Oteyza's opinions as to Plaintiff's limitations due to her back condition, is also supported by good cause and substantial evidence. *See Phillips*, 357 F.3d at 1241 (stating that good cause exists when a treating physician's opinions are "not bolstered by the evidence" or when the evidence supports a contrary finding). The ALJ rejected Dr. Oteyza's opinions as inconsistent with the opinions and testimony of Dr. Witkind and with the other evidence of record. (Tr. 25-26.) The ALJ reasoned that "if the claimant were as limited as Dr. Oteyza's report suggests, then the [ALJ] would expect to see documentation of significant clinical abnormalities" (Tr. 25); instead, Dr. Oteyza's limitations were based "on a condition that is not established by objective medical findings" (Tr. 26).

Specifically, the ALJ noted that the evidence did not support Dr. Oteyza's conclusion that Plaintiff had a herniated disc. (Tr. 25.) Furthermore, the ALJ discounted Dr. Oteyza's finding of radiculopathy, which was based on Dr. Oteyza's EMG study of April 2005. (Tr. 19-20.) The ALJ accepted the testimony of Dr. Witkind that the "EMG result was inconsistent with the MRI results and the physical examination findings and, at best, was a questionable study." (Tr. 19.) The ALJ further noted that Dr. Oteyza's treatment records did not "establish ongoing abnormal findings." (Tr. 27.)

Further, Dr. Witkind interpreted the results of the MRI as not compatible with

Plaintiff's reported pain level of 10 out of 10 at times since there was no nerve compression, and pointed out that the MRI findings were compatible with Plaintiff's age. (Tr. 750.)  Dr. Witkind also stated "the physical exam never fits the EMG, and the EMG never fits the MRI scan." (*Id.*)  Although the opinions of a treating doctor are generally entitled to more weight than those of a nonexamining consultant, the ALJ was free to consider that Dr. Witkind was a board certified neurosurgeon and Dr. Oteyza was a physiatrist.  Thus, the ALJ could conclude that Dr. Witkind was better qualified to opine on many of the key issues regarding Plaintiff's back, such as interpretation of the MRI, interpretation of physical examination findings, whether surgery was indicated, and, ultimately, Plaintiff's limitations.  *See* 20 C.F.R. § 404.1527(d)(5).[8]

Although the ALJ attached greater weight to Dr. Witkind's opinion than to Dr. Oteyza's opinions, the ALJ actually assessed greater limitations on Plaintiff's functional abilities than those imposed by Dr. Witkind. (*Compare* Tr. 22 (determining that Plaintiff can perform light work) *with* Tr. 761 (determining that Plaintiff was "at a medium level of work").)  Further, the ALJ's RFC assessment does not appear to

---

[8] To the extent that Dr. Keller's conclusory note that Plaintiff met the Listing of Impairments 1.04(A), titled disorders of the spine (Tr. 31, 661), could be found consistent with Dr. Oteyza's interpretation of the results of the MRI, the Court notes that Dr. Keller's statement was conclusory and not supported by any explanation. Therefore, the ALJ was free to reject it. *See* 20 C.F.R. § 1527(e) (providing that a statement by a medical source that a claimant's impairment meets or equals the requirements of any impairment in the Listing of Impairments, is not given any special significance because it is an issue reserved to the Commissioner). Furthermore, as Dr. Witkind noted, Dr. Keller's statement appeared to be inconsistent with his physical examination of Plaintiff. (Tr. 758-59.)

be inconsistent with the limitations imposed by Dr. Harper-Nimock, who opined that Plaintiff had "mild to moderate limitations for prolonged sitting, standing, walking, climbing, or heavy lifting" (Tr. 219), as well as with the limitations imposed by Dr. Morford (*see* Tr. 238-45) and Dr. Bancks (Tr. 277-84).

In addition, despite the length of the treatment relationship and the frequency of examination, further good cause and substantial evidence existed to reject Dr. Oteyza's opinions regarding Plaintiff's back condition because almost all of Dr. Oteyza's progress notes do not reflect that a physical examination was performed at the time of each visit, the notes mechanically reiterate Plaintiff's subjective complaints, and it appears that the main purpose of these visits was to obtain prescription renewal.  The ALJ was allowed to consider these factors as bearing on the "[n]ature and extent of the treatment relationship."  20 C.F.R. § 404.1527(d)(2)(ii).  Moreover, Dr. Oteyza's notes do not accurately reflect Plaintiff's employment situation. (*See* Tr. 197-99.)  On May 3, 2004, April 12, 2004, and June 28, 2004, Dr. Oteyza wrote that Plaintiff "continues to work at Moosehaven on modified duties to prevent aggravating her left arm and right wrist" pain (*Id.*), even though the record shows that Plaintiff's last day at work was March 26, 2004 (Tr. 32, 67).

Next, although Dr. Oteyza's limitations in his MSS seem consistent with the findings of the FCE, which was most likely completed by or at the direction of Dr. Oteyza, the Court notes that the FCE indicated that Plaintiff "did not perform with

consistent effort" and "demonstrated cogwheeling behaviors supporting lack of full effort." (Tr. 434, 437.) As the ALJ noted, Dr. Oteyza did not indicate that he ever "considered the claimant's invalid presentation during the FCE." (Tr. 27.) Therefore, Dr. Oteyza's MSS is not supported by the FCE.

Finally, the ALJ thoroughly analyzed Dr. Oteyza's October 7, 2008 statement explaining his MSS. (Tr. 26-27.) In this analysis, the ALJ also considered Dr. Keller's examination and findings, and noted that Dr. Keller never recommended back surgery; he simply stated the "only surgical option would be a two level fusion." (Tr. 27.) Further, Dr. Keller imposed preconditions on surgery, such as a discogram and smoking cessation, which were never done. (*Id.*) In short, the ALJ thoroughly considered the opinions of Dr. Oteyza, which he was obligated to do, but rejected them based on good cause. This rejection is supported by substantial evidence.

## 2.    The ALJ's Decision to Discount Plaintiff's Diagnosis of CTS Is Not Supported by Substantial Evidence

Plaintiff argues that the ALJ "erred by substituting his opinion for the opinions of [a] treating physician" with respect to Plaintiff's diagnosis of CTS because "objective testing documents the condition, and also, [Dr. Witkind] testified to the existence of the condition," and that "[t]his evidence should be relied upon by the Judge to at a minimum include any restrictions that may be the result of the condition." (Doc. 12 at 11-12.) Based on the reasons stated herein, the Court finds that the ALJ's decision in step two of the five-step sequential analysis to discount

22

Plaintiff's diagnosis of CTS and determine that CTS was not a medically determinable impairment, is not supported by substantial evidence. On remand, however, the ALJ may determine what RFC restrictions, if any, should be imposed resulting from Plaintiff's CTS.

The ALJ did not include Plaintiff's diagnosis of CTS in his list of severe or non-severe impairments in step two. (Tr. 19.) The ALJ stated that he "considered including [CTS] as a medically determinable impairment, but ultimately concluded that the existence of this condition was not established by any objective medical findings or by the longitudinal treatment record." (Tr. 20.) The ALJ also stated:

> In 2004 [sic], Dr. Oteyza's treatment notes indicate that the claimant has "injuries to her left arm and right wrist" . . . . There is no evidence describing the nature of these "injuries," let alone diagnostic test results confirming there [sic] existence. On April 25, 2008, Dr. Oteyza reported that the claimant had been diagnosed with right [CTS] by an EMG/NCV, but did not include the test results or recommend any treatment . . . . The claimant has been examined by two consulting physicians, Lynn Harper-Nimock, M.D. and William V. Choisser, M.D. and both sources reported that she demonstrated intact hand and finger dexterity; grip strength of 5/5 bilaterally; full range of motion of the shoulders, elbows, forearms and wrists . . . .

(*Id.*)

As pointed out by Plaintiff, there is objective medical evidence that documents the condition. As an initial matter, even Dr. Witkind testified at the September 18, 2008 hearing that Plaintiff's right wrist pain "should be somewhat of a mild case of [CTS]" and that the EMG "just show[ed] some mild increased latency of the speed of neural traveling across the right carpal tunnel," even though he noted there was

no atrophy in Plaintiff's right hand or thumb.  (Tr. 748.)  Importantly, Plaintiff was diagnosed with CTS by Dr. Oteyza on May 13, 2002, based on the results of the May 9, 2002 EMG/Nerve Conduction Study.[9]  (Tr. 637, 640.)  Contrary to the ALJ's statement, the results of the EMG/Nerve Conduction Study were included in the record.  Specifically, the study revealed "prolong median sensory distal latency compatible with [CTS]."  (Tr. 640.)  Furthermore, Dr. Witkind did not discredit this study; rather, he appeared to accept it.  (Tr. 748.)

Also contrary to the ALJ's statement that Dr. Oteyza did not recommend any treatment, the record shows that Plaintiff was using a carpal tunnel splint.  At the time of diagnosis, Plaintiff was "provided with a carpal tunnel splint to be used when she [was] lifting patients at work at Moosehaven."  (Tr. 637.)  Dr. Oteyza's progress report, dated February 10, 2003, shows that Plaintiff "continues to use a wrist splint when she is lifting patients" and that the "range of motion to her wrist has improved," even though "it is still guarded and painful."  (Tr. 614.)  Therefore, the reasons the ALJ provided for not including CTS as a medically determinable impairment are not supported by substantial evidence.[10]

---

[9] In 2006, Dr. Harper-Nimock diagnosed Plaintiff with, *inter alia*, a history of "nerve damage, left arm and right wrist."  (Tr. 219.)

[10] The ALJ's reliance on the findings of Dr. Harper-Nimock and Dr. Choisser that Plaintiff's grip strength was 5/5 and her hand and finger dexterity was intact are not sufficient to support the ALJ's conclusion to reject CTS as a medically determinable impairment in light of the other evidence discussed above.  Substantial evidence must be viewed in light of the entire record.  *See Foote*, 67 F.3d at 1560 ("The district court must view the record as a whole . . . .").

24

The Commissioner argues that even assuming CTS is a medically determinable impairment, any error in this regard is harmless because the Court can determine that it is not a severe impairment.  (Doc. 17 at 15.)  First, this Court declines the invitation to engage in "direct fact finding" as this is "an affront to the administrative process." *McDaniel v. Bowen*, 800 F.2d 1026, 1032 (11th Cir. 1986). In addition:

> An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.  Claimant need show only that her impairment is not so slight and its effect is not so minimal.

*Id.* at 1031.  At step two, the claimant's burden is "mild" and "only claims based on the most trivial impairments [can] be rejected."  *Id.*

Dr. Oteyza's MSS provided that Plaintiff's manipulative functions (reaching in all directions, handling, fingering, and feeling) were limited to the extent that Plaintiff could occasionally reach, handle, and finger, and could frequently feel.  (Tr. 303.) Dr. Oteyza based these limitations on the EMG study, which he interpreted as showing "left ulnar upper extremity neuropathy and severe [CTS] to the right hand." (*Id.*)  Given this evidence, the Court cannot say there was harmless error in this regard.

## VI.    Conclusion

In light of the foregoing, the Court finds that the ALJ's decision to reject Dr. Oteyza's opinions regarding Plaintiff's back condition is supported by good cause

25

and substantial evidence.   Therefore, the Court will affirm on the first issue. However, the ALJ's decision is due to be reversed and remanded on the second issue because the ALJ's determination to discount Plaintiff's diagnosis of CTS for purposes of determining whether Plaintiff's CTS was a medically determinable impairment, is not supported by substantial evidence.

Accordingly, it is **ORDERED**:

1.     The Clerk of Court is directed to enter judgment, pursuant to sentence four of 42 U.S.C. § 405(g), **REVERSING** the Commissioner's decision **and REMANDING** with instructions to the ALJ: (a) to find that Plaintiff's CTS is a medically determinable impairment and determine whether it is a severe impairment; (b) if appropriate, to reevaluate Plaintiff's RFC assessment and to determine what types of work if any, Plaintiff can perform; and (c) to conduct any further proceedings deemed appropriate.

2.     The Clerk of Court is further directed to close the file.

3.     Should this remand result in the award of benefits, pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, Plaintiff's attorney is **GRANTED** an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b).  Plaintiff's attorney shall have thirty (30) days from the date of the Commissioner's letter sent to Plaintiff's counsel of record at the conclusion of the Agency's past due benefit calculation stating the amount withheld for attorney's fees, to file such a petition for attorney's fees.  This Order does not

extend the time limits for filing a motion for attorney's fees under the Equal Access

to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on April 4, 2011.


_____
JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

Counsel of Record

27